IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-38 |
| | ) | (VARLAN/SHIRLEY) |
| ERNEST RAYMON STENNIS, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This matter is before the Court on the Defendant's Motion to Suppress

Evidence [Doc. 13], filed on August 22, 2008. The parties came before the Court for a suppression

hearing on September 15, 2008. Assistant United States Attorney Hugh B. Ward, Jr., represented

the government. Attorney Kim A. Tollison appeared on behalf of the Defendant, who was also

present. At the conclusion of the hearing, the Court took the motion and related filings under

advisement.

The Court filed a Report and Recommendation [Doc. 23] recommending that the

District Court deny the Motion to Suppress on October 15, 2008. Earlier that same day, the

government filed a Notice of Late-Filed Exhibits [Doc. 22]. The Court did not consider these

exhibits, which consists of a DVD from Officer David Roncska's police cruiser and a statement by

Officer Roncska and Officer Jeremy Jinnett, in its recommendations regarding the Motion to

Suppress. The Defendant subsequently filed a Motion to Reconsider [Doc. 28], pointing out

1

discrepancies between statements on the late-filed DVD and Officer Roncska's testimony at the suppression hearing. The government responded [Doc. 31] that the Court's recommendation was supported by Officer Roncska's sworn testimony and that the late-filed exhibits only supplemented that testimony. The Court granted [Doc. 33] the Motion to Reconsider, finding that the late-filed DVD raised questions about Officer Roncska's testimony at the suppression hearing, particularly his testimony regarding his basis for performing a frisk of the defendant. The Court ordered that the suppression hearing be reopened in order to explore the information in the late-filed DVD, to hear any additional testimony relevant to the late-filed DVD, and to entertain the arguments of the parties on the effect of the late-filed DVD on the prior testimony and the outcome of the Motion to Suppress.

On December 8, 2008, the parties appeared for the reopened suppression hearing. Assistant United States Attorney Ward again represented the government. Attorney Tollison appeared on behalf of the Defendant, who was also present. The Court heard the testimony of Officers Roncska and Jinnett and the arguments of the parties and then again took the matter under advisement.

The Defendant is charged [Doc. 3] in Count One with possession of five grams or more of "crack" cocaine with intent to distribute and in Count Two with possession of a .38 caliber revolver and ammunition in furtherance of a drug trafficking crime. The Defendant contends [Doc. 13] that the police searched his person without probable cause, a search warrant, or consent in violation of his Fourth Amendment rights. He asks that all evidence seized in the search be suppressed.

2

The government responds [Doc. 16] that a law enforcement officer may stop a vehicle if he or she has reasonable suspicion that the vehicle's occupants are involved in past or present illegal activity. Once the officer stops a vehicle for a traffic violation, the officer may properly order the occupants out of the car for the duration of the stop. The government contends that the officers may also perform a "Terry search" of a suspect and the vehicle for weapons as long as the officer has an articulable and reasonable belief that the suspect may be armed and dangerous. Finally, it maintains that assuming the officer has probable cause to arrest the suspect, the officer may conduct a full search of the suspect for weapons and evidence incident to the suspect's arrest.

## I. SUMMARY OF TESTIMONY

### A. September 15, 2008 Suppression Hearing

Officer David Roncska, of the Knoxville Police Department (KPD), testified that on April 8, 2007,[1] he was on patrol in the East Sector of Knoxville, when he encountered the Defendant Ernest Stennis. He had first encountered the Defendant a month earlier while investigating a domestic dispute near the Defendant's residence on Riverside Drive. A male had contacted the KPD, complaining that his live-in girlfriend had disposed of some of his property. Roncska went to the residence and questioned the girlfriend about the missing property. The girlfriend told him that she was addicted to crack cocaine and had traded the items in question to a man named Ernest,

---

[1]The Court notes that in the original Report and Recommendation [Doc. 23], it incorrectly gave the date of the stop of the defendant as April 8, 2008. At the December 8, 2008 reopened suppression hearing, the parties agreed that the stop actually occurred on April 8, 2007. This date has never been in dispute, and the Court has corrected the error in the year in its summary of the testimony at the September 15 hearing. Other than changing the year from 2008 to 2007 each time it is mentioned, the Court has made no alteration to its summary of the testimony of the September 15 hearing.

who was in a wheelchair and who lived down the road, in exchange for crack. The girlfriend said that Ernest kept firearms and narcotics in his groin area.

Officer Roncska stated that he went to the residence identified by the girlfriend and found the Defendant, who is wheelchair bound, there along with his wife and some other people. The Defendant and his wife consented to Roncska entering and looking around their home. The Defendant told him that he had purchased a television and some other electronic equipment from the girlfriend. Roncska described the individuals present as "evasive" with regard to his questions about narcotics and said he did not pursue the matter any further.

Roncska testified that on April 8, 2007, he stopped the Defendant, who was driving a Cadillac with an inoperable tag light, at the intersection of Linden and Harrison Streets. Roncska explained what transpired in the stop, while viewing a DVD (Exhibit No. 1) of footage from that evening recorded on his in-car camera. He stated that he called in the traffic stop and began a records check but did not learn of the Defendant's two prior felony convictions at the time because they were not from Knox County. At the beginning of the stop, Roncska recognized the Defendant from the previous encounter involving the missing property. He assisted the Defendant out of his car and into his wheelchair. As the Defendant sat down in his wheelchair, Roncska could see two rigid objects, which he believed to be weapons, creating bulges in the Defendant's waistline and just under his groin area. He decided to perform a Terry pat down and asked the Defendant for permission to search him at the same time that he pulled up the Defendant's shirt. Roncska found two handguns and narcotics in the Defendant's pants.

Officer Roncska stated that a subsequent search of the Defendant's car revealed a black bag on the front passenger's seat that contained a digital scale, a plastic bag holding twenty-six

hydrocodone pills, two percocet pills, an unlabeled pill bottle with eight percocet pills, another plastic bag containing an unidentified blue pill and an unidentified white pill, and four .38 caliber rounds. The Defendant was arrested and advised of his <u>Miranda</u> rights. The Defendant agreed to give a statement and explained that the guns were for his protection.

Officer Roncska testified that in his police report, he stated that the Defendant consented to the search of his person. He said that the DVD demonstrates that he gave the Defendant numerous opportunities to reject consent to get out of his car, but the Defendant exited his car willingly. He then asked the Defendant if he had anything illegal on him and if the Defendant would mind if he looked. Roncska stated that the DVD shows that the Defendant put his hands up as if to say he did not care if Roncska searched him. The Defendant never objected to the search. At that point, Roncska saw something that he believed was a weapon and decided to perform a <u>Terry</u> pat down. Later that evening, Roncska took the Defendant to the hospital for his medical condition. While at the hospital, the Defendant said that he remembered the previous encounter with Roncska.

On cross-examination, Officer Roncska testified that the incident that occurred a month before he stopped the defendant arose out of a domestic dispute at Marble Hill Lane. He confirmed that a man from that residence reported that his live-in girlfriend had taken some of his property. The girlfriend admitted that she had traded the property for drugs. The man ultimately decided not to pursue charges against his girlfriend at that time.

Officer Roncska agreed that he stopped the Defendant around 11:20 p.m. for not having a tag light. After questioning the Defendant and asking for his driver's license, Roncska asked to search his car. The Defendant agreed to a search of the car. The Defendant got out of the

car and sat in his wheelchair. At that time, Roncska saw a large, rigid object in the Defendant's groin area and knew from the incident with the crack-addicted girlfriend that the Defendant carried guns in his pants. Roncska asked the Defendant, "Do you mind if I look?" while he simultaneously pulled up the Defendant's shirt. Roncska stated that because the Defendant did not object as he pulled up the Defendant's shirt and asked to search, he took that as the Defendant giving consent. Roncska admitted that the Defendant never gave him a verbal response to his question about looking. He began by patting down the Defendant, but it turned into a search when he identified a rigid object that was not part of the Defendant's anatomy. As he reached down to touch the Defendant's shirt, he felt a weapon. Even though the Defendant was in a wheelchair, Roncska feared for his safety because the Defendant still had use of his hands. Officer Roncska acknowledged that he later told the Defendant, "[C]rack heads tell us everything when they want to get out of jail."

### B. December 8, 2008 Reopened Suppression Hearing

KPD Officer David Roncska testified that although he had previously testified that he had encountered the defendant a month before the April 8, 2007 traffic stop, this prior encounter had actually occurred four months before the stop on December 27, 2006. On that day, he responded to a domestic dispute at the Marble Hill residence of two individuals named Joyce and Aaron. An audio recording of this encounter is on the late-filed DVD [Doc. 22] provided by the government. Roncska stated that from December 27, 2006, through April 8, 2007, when he stopped the Defendant, Roncska encountered Joyce and Aaron on three occasions: (1) on December 27, 2006, when Aaron accused Joyce of trading his property for narcotics, (2) when Roncska responded to a

6

call about a car fire and arrived to find Aaron's Land Rover engulfed in flames, and (3) when Roncska followed up on a call to 911 regarding threats made to Joyce and Aaron.

Officer Roncska testified that on December 27, 2006, he and KPD Officer Jinnett responded to the home of Joyce and Aaron. Joyce told him that she had traded a large amount of property to an individual named "Pete," who lived down the road. Joyce told him the name of the road on which Pete lived, gave directions to his residence from hers, and described Pete's residence. Joyce told him that Pete dealt in narcotics, that she had a narcotics problem, and that she had traded a large amount of property and money for narcotics. Joyce said that Pete was armed and that he kept his weapon and narcotics in his groin area. She described Pete as a middle-aged black male who was confined to a wheelchair. Roncska said that although he had previously testified that Joyce told him she had traded the property to an individual named Ernest, Joyce had actually referred to this individual as "Pete" at the time of their encounter on December 27, 2006. He testified that although he recalls Joyce telling him that Pete kept his weapon in his groin area, this statement is not on the late-filed DVD.

Officer Roncska stated that after talking with Joyce and Aaron, he followed Joyce's directions to a residence that he identified as the Defendant's house. He and Officer Jinnett knocked on the door at the rear of the residence, and the Defendant's wife answered. Roncska had met the Defendant's wife before in relation to a prior domestic situation involving either her or the defendant's brother. Roncska asked the Defendant's wife if she remembered him, and she said that she did. Officer Jinnett asked the Defendant's wife if her husband was in a wheelchair, and she responded that he was. The officers entered the home and encountered the Defendant, who was in a wheelchair. They informed the Defendant and his wife that a female had made allegations that

7

narcotics were coming out of their residence and that they had some stolen items. The Defendant and his wife identified the person making the allegations as Joyce. Roncska said he did not search the Defendant at this time because the Defendant was in his own home, he did not know the Defendant was a felon, and he did not see a bulge in the Defendant's pants or anything that appeared to be a weapon during this encounter. The Defendant pointed out the property he had gotten from Joyce, but the officers did not seize it because Aaron refused to prosecute Joyce.

Officer Ronska testified that when he responded to the subsequent call about the car fire, Joyce and Aaron alleged that the defendant and other individuals had set Aaron's car on fire because he and Joyce had talked to the police about the Defendant. They referred to the individual whom they believed had set the fire as "Ernest." Joyce, for the second time, identified him as being in a wheelchair.

Officer Roncska testified that his third encounter with Joyce and Aaron was in response to a call to 911 in which they stated that they wanted to talk to an officer regarding threats to kill them. He spoke primarily with Aaron, who was concerned about threats he and Joyce had been receiving from the Defendant and his associates. They referred to the individual making the threats as "Ernest."

On cross-examination, Officer Roncska testified that he had previously arrested Aaron for possession of a small amount of marijuana and that Aaron had just got out of jail on the day of the December 27, 2006 encounter and had returned home to find his property missing. Roncska agreed that the audio recording of his December 27, 2006 encounter with Joyce and Aaron contains no reference to Pete being in a wheelchair, nor does it contain the statement that Pete kept firearms and narcotics in his groin area. He explained that the recording of his encounter with Joyce

and Aaron contains a "dead spot" because he had turned his microphone off while having a conversation with Officer Jinnett. He stated that although he is suppose to have his microphone on when speaking to members of the public, he forgot to turn the microphone on again when he resumed his conversation with Joyce and Aaron. He stated that the audio recording does reflect that Joyce said that Pete had a gun.

Officer Roncska stated that although Joyce had said Pete lived in a trailer, the defendant lived in a house, which resembled a trailer. He said that he went to the Defendant's house expecting to see a man in a wheelchair based upon what Joyce had told him. He did not recall saying, "This is where the crippled guy lives," when he pulled up to the Defendant's house. He said that when he spoke with the Defendant, the Defendant told him that Joyce had brought the property in question to him and he had bought it for around $200. The Defendant offered to let the officers take the property, but the property was never confiscated.

Officer Roncska testified that he did not know the date on which the car-fire incident occurred. He did not file a police report on the car fire because the matter was turned over to an arson investigator. Although Joyce and Aaron claimed that the Defendant and some other individuals set the fire, they did not see the perpetrators. The 911 call occurred just after the car-fire incident, but Roncska could not determine the exact date.

KPD Officer Jeremy Jinnett testified that he was on duty on December 27, 2006, when he responded to a call about a domestic situation involving Joyce and Aaron. He stated that he had been to their home on one prior occasion regarding another domestic situation. On December 27, Aaron called the police and reported that his girlfriend Joyce had traded his electronic equipment for crack cocaine. When Jinnett arrived at the scene, Officer Roncska was already there. Aaron

complained that Joyce had taken his computer, television, and other property along with money from his bank account to Pete's house and traded it for crack. Joyce initially denied this accusation. At some point Joyce and Aaron described Pete's appearance, said that he was in a wheelchair, described where he lived, and stated that he kept a pistol, crack, and possibly marijuana in the front of his jeans.

Officer Jinnett testified that he had listened to the audio recording of the December 27, 2006 encounter made by Officer Roncska's in-car camera, and he did not remember Joyce or Aaron stating on the recording that the Defendant was in a wheelchair or that he kept drugs or guns in his pants. He stated that December 27, 2006, was the first time he had ever encountered the Defendant or his wife. Before encountering the Defendant on that day, he knew the Defendant was in a wheelchair because Joyce told him. The officers did not search the Defendant when they met him in his home because the clothing he was wearing gave them no reason to think he had a weapon on his person. The officers told the Defendant that Joyce and Aaron who lived up the street were claiming that Aaron's property was in the defendant's house. The Defendant confirmed that he had the property and led the officers to a back bedroom where he showed them the property.

Officer Jinnett testified that he also responded to the scene when Aaron and Joyce's vehicle was on fire at their Marble Hill residence. The couple said the fire was in retaliation because the Defendant had heard that they had spoken with the police about the trade of electronic equipment for crack. Jinnett said he thought Joyce and Aaron referred to the Defendant as "Pete" at this time also. Officer Jinnett also responded to the scene of the April 8, 2007 traffic stop of the Defendant. He said he was completing paperwork when Roncska came to his cruiser and said he had found a pistol and narcotics in the front of the Defendant's pants.

On cross-examination, Officer Jinnett testified that he also made an audio recording of the events on December 27, 2006, but that he did not request a copy of it in time to bring it to the hearing. He said that the car-fire incident with Joyce and Aaron was several weeks to a couple of months after the December 27, 2006 encounter. He said that a police report would have been made of the car-fire incident and would be on file at the police department. He did not recall whether Joyce and Aaron saw someone do something to the car.

## II. FINDINGS OF FACT

### A. April 8, 2007 Stop

Based upon the testimony of Officer Roncska and the Court's own review of the DVD of April 8, 2007, the Court finds the following facts regarding the stop of the Defendant: Officer Roncska pulled the Defendant over at 11:20 p.m. on April 8, 2007. Roncska went to the driver's side window of the Defendant's car and explained to the Defendant that he stopped him for having an inoperable tag light. He asked for the Defendant's driver's license, which the Defendant provided. He asked to see the Defendant's registration, but the Defendant could not find it. Roncska asked the Defendant if he had anything illegal in the car, and the Defendant denied that he did. Roncska asked the Defendant to wait in his car while Roncska returned to his cruiser. Seven and one-half minutes later, Roncska returned to the Defendant's car, asked again whether there was anything illegal in the car, and asked the Defendant if he could take "a peek," meaning could he search the car. The Defendant responded that he did not care if Roncska searched his car. Roncska returned to his cruiser again for nearly four minutes.

11

Roncska approached the Defendant's driver's side window a third time and asked if the Defendant needed his wheelchair to get out of the car. Although the Defendant told Roncska that he could get out of the car without assistance, Roncska asked if it would be easier for his partner to retrieve the wheelchair for the Defendant. The Defendant agreed to let the other officer get his wheelchair. The second officer got the Defendant's wheelchair from the backseat through the rear, passenger's side door. A third officer arrived. Roncska opened the Defendant's driver's side door and pushed the wheelchair to the side of the car by the door. The Defendant placed his arms on the car door and the roof of the car and lifted himself into the wheelchair, while Roncska held the wheelchair in place. Roncska stood over the Defendant looking down at him while the Defendant arranged himself in his wheelchair. Roncska testified that at this point, he noticed bulges at the Defendant's waistline and in the groin area of the Defendant's pants.

Once the Defendant was in his wheelchair, the Defendant rolled the wheelchair a few feet back away from the car. Roncska told the Defendant that the other officer would push him further away from the car. The other officer took the handle of the wheelchair, and Roncska asked the Defendant if he had anything in his jacket[2] while simultaneously grabbing and lifting the jacket and feeling the outside of the pocket. Roncska then asked the Defendant if he had anything in his pants and began patting down the Defendant's pants. The Defendant responded, "No Sir." Roncska said, "What's that right there, Sir?" and then ordered the Defendant to put his hands on his head. Roncska asked the Defendant, "Mind if I take a look here?" while lifting the Defendant's jacket. The Defendant replied, "No, Sir." Roncska then pulled a gun from the Defendant's pants. Roncska

---

[2] The Court notes that in the April 8, 2007 DVD, the Defendant appears to be wearing a sleeveless outer garment, which the Court will refer to as a jacket, over a long-sleeved shirt.

12

told the other officer to handcuff the Defendant. Roncska continued to search inside the Defendant's pants while asking him if he had anything else concealed in them. Roncska found a second gun and drugs on the Defendant. The other officers subsequently searched the Defendant's car.

## B. December 27, 2006 Encounter

The Court also makes the following findings regarding Officer Roncska's previous encounter with the residents of Marble Hill and the defendant, based upon the testimony of Officers Roncska and Jinnett and the Court's own review of audio recording of the events of December 27, 2006, contained on the late-filed DVD: On December 27, 2006, Officers Roncska and Jinnett responded separately to a domestic dispute at the Marble Hill residence of Aaron and Joyce. Aaron, who had got out of jail earlier that day, claimed that he returned to his home to find that his girlfriend Joyce had traded some of his property and money to an individual in exchange for crack cocaine. Joyce eventually admitted that she used crack cocaine and that she traded the property in question to an individual named Pete for crack. She stated that Pete lived "up the road" in the second trailer on the right on Riverside Drive and that Pete's trailer had a Christmas tree in front. Joyce described Pete as a "thirty-something" black male who was "crippled" and said that he lived with his wife. She said that Pete carried a pistol and asked the officers not to tell Pete who told them about him or he would kill her. Aaron told Roncska that he did not want to prosecute Joyce.

The officers left the Marble Hill residence and followed Joyce's directions to a house on Riverside Drive. Officer Roncska recognized the house because he had previously been there for a domestic dispute between Mrs. Stennis and her brother or brother-in-law. While waiting for

13

someone to answer the door, Roncska told Jinnett, that "the crippled guy" lived in this house and asked if Jinnett remembered that he was in a wheelchair. Jinnett affirmed that he did. Mrs. Stennis, the Defendant's wife, answered the door and confirmed that her husband Ernest is in a wheelchair. Mrs. Stennis allowed the officers to enter the house, and they spoke with the Defendant and Mrs. Stennis. The officers told the Defendant they had a report of illegal narcotics and stolen property being in his house, but the Defendant denied there was anything illegal in the house. The Defendant stated that he bought a flat screen television and a computer for $240 from a woman named Joyce who told him that she was getting rid of these items because she was moving. Roncska told the Stennises that the property they purchased from Joyce was stolen. The Defendant's wife described Joyce and where she lived. The Defendant offered the property to Roncska, but Roncska declined to confiscate the property at that time because Aaron did not want to prosecute Joyce.

At a later date, the officers responded to a car fire at Aaron and Joyce's Marble Hill residence. The couple believed that the individual to whom Joyce had traded property had set Aaron's vehicle on fire in retaliation for their telling the police about him. Joyce and Aaron did not see who set the fire.

Officer Roncska later responded to the Marble Hill residence a third time, when Aaron placed a 911 call regarding threats against his life. Aaron stated that he and Joyce had received threats that they would be killed from Ernest and his associates.

### III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant contends that his rights under the Fourth Amendment were

14

violated because the officer searched his person without his consent or probable cause. The Defendant does not contest the validity of the traffic stop or his consent to search his car. Instead, he argues that he did not give consent to search his person before the officer began searching him and that his consent to search his car was not also consent to search his person.

Although the Defendant does not contest his being required to get out of his car, the Court notes that an officer may properly ask the driver of a vehicle to get out of the car during a traffic stop, such intrusion being "*de minimis*" in relation to the stop itself. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977); United States v. Burton, 334 F.3d 514, 519 (6th Cir. 2003). With regard to the frisk of the Defendant's person, an officer may frisk a suspect for weapons in order to assure the officer's safety if a reasonable officer under those circumstances would be justified in believing his or her safety was at risk. See Terry v. Ohio, 392 U.S. 1, 27 (1968); United States v. Strahan, 984 F.2d 155, 158 (6th Cir. 1993). This standard also applies when the individual is stopped for a traffic violation, permitting the officer to frisk for weapons if a reasonable person would conclude that the detainee "might be armed and presently dangerous" based upon the circumstances known at the time. Mimms, 434 U.S. at 111-112; see also Michigan v. Long, 463 U.S. 1032, 1048 (1983); United States v. Myers, 102 F.3d 227, 232 (6th Cir. 1996) (holding that it is well-settled that an officer may frisk the subject of a traffic stop). "The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he 'had an indication' that the defendant was in fact armed." United States v. Bell, 762 F.2d 495, 500 n.7 (6th Cir. 1985). However,

> the Fourth Amendment does not tolerate, nor has the Supreme Court . . . ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous. The Supreme Court has,

15

in interpreting the Fourth Amendment, struck a balance between the justifiable concern for officer safety when confronting an individual and the substantial individual interest in being free from unreasonable intrusion.

Bennett v. City of Eastpointe, 410 F.3d 810, 841 (6th Cir. 2005).

In the present case, the Court examines the totality of the circumstances to determine whether Officer Roncska had a reasonable belief that the Defendant could be armed and potentially dangerous, thus justifying a Terry pat-down. Officer Roncska testified that as the Defendant exited his car and sat in his wheelchair, Roncska noticed bulges in the Defendant's waistline and groin area that he believed were consistent with weapons. Roncska was standing behind and over the Defendant as the Defendant positioned himself in his wheelchair and, thus, was in a position from which he could view the bulges to which he testified.

In addition to the bulges Roncska observed, the Court notes that Roncska had information from a December 27, 2006 encounter with individuals who lived near the Defendant that the Defendant went armed. While investigating a missing property call on December 27, 2006, Roncska learned from the girlfriend Joyce who had purportedly disposed of the property that was the subject of the investigation that she had traded the property to thirty-year-old black male, who was crippled and who lived nearby on Riverside Drive, in exchange for crack cocaine. Joyce also told Roncska that the man, whom she identified as Pete, carried a pistol and that she feared he would kill her if he learned that she had told the police about him.

The Defendant objects to the reliability of this information from an admitted "crack-head," noting Officer Roncska's statement to the Defendant that crackheads will tell the police anything to get out of jail. Although an anonymous tip that a person is carrying a gun cannot alone support a stop and frisk for weapons, Florida v. J.L., 529 U.S. 266, 271 (2000), the present tipster

16

was not anonymous. While Officer Roncska could not recall her name at the initial suppression hearing, he testified at the reopened suppression hearing that her name was Joyce and that she lived at Marble Hill, facts that were confirmed by the audio recording of the encounter. Also, Roncska corroborated several pieces of the information he received from Joyce during his December 27, 2006, encounter with the Defendant. Roncska went to the location Joyce had indicated on Riverside Drive and found an individual who was wheelchair bound. This man, whom Roncska later recognized to be the Defendant during the stop, confirmed that he had received a television and other electronic items from Joyce, although he denied that he had traded her drugs for these items. Finally, the Court would note that in addition to the corroboration of the innocent facts from Joyce's report, Joyce made an admission against her own interest when she stated that she traded the missing property for crack. Considering the corroboration of Joyce's statements, the Court finds that Officer Roncska could reasonably rely upon her information as a basis for his belief that the Defendant was armed and potentially dangerous at the time of the stop.

The Defendant also questions Officer Roncska's credibility due to the discrepancies between his testimony at the original suppression hearing and the audio recording of his actual encounter with Joyce on December 27, 2006. Roncska originally testified that his investigation of the missing property, which led him to the Defendant's house, occurred approximately one month before he stopped the Defendant on April 8, 2007. Roncska subsequently testified that the initial encounter occurred on December 27, 2006, a fact which was corroborated by the audio recording, and that he had two other encounters with Joyce and her boyfriend Aaron between December 27, 2006, and April 8, 2007. Roncska originally testified that Joyce identified the man to whom she had traded property for crack as "Ernest," but subsequently testified that she called him "Pete," a fact

17

which is also corroborated by the audio recording. Roncska was able to identify "Pete" as the Defendant by following Joyce's directions to the Defendant's house and by the Defendant's statement that he received property from Joyce.

Finally, the Defendant also argues that Roncska's original testimony that Joyce told him that the man to whom she traded the property was in a wheelchair and kept a gun and narcotics in his pants is not corroborated by the audio recording of Roncska's December 27, 2006 encounter with Joyce. At the reopened suppression hearing, Roncska explained that Joyce told him that Pete was in a wheelchair and that he kept a gun and drugs in his groin area during a time when he had his microphone off. The Court notes that the audio recording does contain a twelve-minute time span during which Roncska's microphone was off. Moreover, Officer Jinnett also testified that Joyce told them that Pete was in a wheelchair and that he kept guns and drugs in his pants. The Court finds that Officer Roncska's testimony at the reopened suppression hearing about the earlier encounter with Joyce and the Defendant was generally credible, even if it was somewhat inarticulate and confusing. More importantly, the Court need not rely on the testimony regarding whether Roncska was told that the defendant carried a gun in his groin area, because for the limited purpose of a Terry pat down analysis, the key facts that Pete (i.e., the Defendant) was crippled, where he lived, that he carried a pistol, and that Joyce feared he would kill her are contained on the audio recording and were known to Roncska prior to the April 8, 2007 pat down.

Accordingly, the Court finds that the bulges in the Defendant's clothing observed by Officer Roncska along with the information from his earlier investigation that the Defendant carried a pistol and had threatened to kill those whom he believed had exposed his drug business provided Roncska with a reasonable basis to believe that the Defendant was or might be armed and/or

18

dangerous and provided Roncska with justification to believe his safety might be at risk. Thus, Roncska could properly perform a <u>Terry</u> pat-down of the Defendant after he got out of the car on April 8, 2007.

At the original suppression hearing, the Defendant argued that Officer Roncska went beyond a <u>Terry</u> frisk and, instead, performed a search under his clothing after he got out of his car. The Court's review of the April 8, 2007 DVD discloses that after the Defendant got out of his car and into his wheelchair, he rolled himself away from the car a few feet. At that point, Officer Roncska instructed the Defendant that another officer would push him farther away from the car. Roncska touched and lifted the Defendant's jacket and felt the outside of the pocket. Roncska then patted down the Defendant's pants. Although Roncska lifted the bottom of the jacket to manipulate it, the Court finds this was due to the logistics of Roncska standing and the Defendant sitting, rather than an attempt by Roncska to look underneath the jacket. Moreover, the Court notes that Roncska testified that once he touched the Defendant's jacket, he felt what he believed to be a weapon. Once Roncska felt the weapons under the Defendant's clothing, he could properly reach inside of the Defendant's clothing to retrieve them. Accordingly, the Court recommends that the Defendant's Motion to Suppress Evidence [Doc. 13] be denied.

Because the Court has held that Officer Roncska had a reasonable basis to perform a <u>Terry</u> frisk of the Defendant, it does not need to reach the question of whether and when the Defendant consented to a search of his person. Nevertheless, the Court would note that Officer Roncska's stated belief that the Defendant had consented to a search of his person because the Defendant did not object to the search as he proceeded to search him is contrary to Sixth Circuit law. Consent to search must be "unequivocal and intelligently given, untainted by duress or coercion."

United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990) (citing United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977); see also United States v. Ivy, 165 F.3d 397, 402 (6th Cir. 1998). Furthermore, consent must be more than mere acquiescence to apparent lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999). Additionally, consent "must be proved by clear and positive testimony[.]" United States v. Williams, 754 F.2d 672, 675 (6th Cir. 1985).

Finally, during its closing argument at the September 15, 2008 suppression hearing, the government orally moved for the Indictment to be amended to reflect the date of April 8, 2007, rather than April 1, 2007. The Defendant had no objection to amending the Indictment to reflect the April 8, 2007 date. Defense counsel noted that the Defendant would not be prejudiced by the change because the April 8, 2007 date was on the state warrants and the DVD. The Court notes that the DVD reflects that the date of the stop and search was April 8, 2007. Because the parties agree to the proposed amendment, the Court recommends that the date in both counts of the Indictment be changed to April 8, 2007.

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [**Doc. 13**] be **DENIED** and that the government's oral motion to amend the date in the Indictment be **GRANTED**.[3]

Respectfully submitted,


    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

21